UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EXERGEN CORPORATION,            )
                               )
     Plaintiff,                )
                               )
v.                             )        CIVIL ACTION NO.
                               )        08-cv-11416-DPW
KIDS-MED, INC., AMERICAN       )
SCIENTIFIC RESOURCES,INC.,     )
and TECNIMED, S.R.L.,          )
                               )
     Defendants.               )

MEMORANDUM AND ORDER
REGARDING CLAIM CONSTRUCTION
May 23, 2016

Plaintiff Exergen brings this patent infringement alleging

that Defendant Tecnimed's Thermofocus® non-contact infrared

forehead thermometer (the "Thermofocus") infringes Exergen's Ear

Thermometer Patent, U.S. Patent No. 5,012,813 (the "'813 Patent")

and its Armpit Thermometer Patents (the "'435 Patent Family").[1]

Patent infringement litigation "involves a two-step

process:  the court first determines the meaning of disputed

---

[1] The '435 Patent Family consists of four patents that share the
title "Ambient and Perfusion Normalized Temperature Detector."
*See* U.S. Patent No. 6,056,435 (filed Jun. 24, 1997) (the "'435
Patent"); U.S. Patent No. 6,299,347 (filed May 1, 2000) (the
"'347 Patent"); U.S. Patent No. 6,499,877 (filed Aug. 28, 2001)
(the "'877 Patent"); and U.S. Patent No. 7,314,309 (filed Nov.
14, 2005) (the "'309 Patent").

claim terms and then compares the accused device to the claims as construed." *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009). This case is at the claim construction stage, and I review the claim terms disputed by the parties accordingly.[2]

## I. BACKGROUND

Exergen's patents relate to infrared thermometers that measure body temperature by detecting infrared radiation emitted from a body surface such as the tympanic membrane (eardrum) or axilla (armpit). The temperature measurement of a body surface tends to be lower than the temperature within the body because the surface is exposed to the ambient (air) temperature. By correcting a measured surface temperature to account for the ambient temperature, the thermometer calculates the temperature in accordance with temperature relationship formulas described in the patents.

The original temperature relationship described in the '813 Patent is said to have been improved upon in subsequent patents

---

[2] Defendants Kidz-Med, Inc. and American Scientific Resources, Inc. adopted both Tecnimed's claim construction brief and its response to Exergen's opening claim construction brief. However, American Scientific Resources thereafter filed for bankruptcy and it appears Kidz-Med is no longer a going concern. Neither is represented by counsel any longer in this case. Consequently, I have informed counsel that both entities will be treated as non-parties in the ongoing proceedings in this case.

to give more accurate measurements of internal temperature.  The '435 Patent Family involves thermometers that account for changes in the "perfusion rate," i.e. the blood flow per unit area, which affects the transfer of heat from within the body to the surface.

Tecnimed's Thermofocus, by contrast, is a non-contact thermometer that measures temperature from the forehead without touching the skin.  Unlike the ear and armpit, which are "enclosed," the forehead is entirely exposed to the environment and therefore requires a special means for compensating for the effects of ambient temperature.

## II. CLAIM CONSTRUCTION PRINCIPLES

As a "bedrock principle" of patent law, "the claims of a patent define the invention to which the patentee is entitled the right to exclude."  *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004).  A patent claim is "the portion of the patent document that defines the scope of the patentee's rights."  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).  "The construction of these claims is a question of law to be determined by a judge."  *Amesbury Group, Inc. v. Caldwell Mfg. Co.*, No. 08-10171-DPW, 2008 WL 5396473, at *2 (D. Mass. Dec. 17, 2008) (citing *Markman*, 517 U.S. at 384, 390-91).

3

When evaluating "the words of a claim," the court generally gives these terms "their ordinary and customary meaning," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)), which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313 (citing *Innova*, 381 F.3d at 1116). Sometimes, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent," in which case claim construction "involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

However, when that meaning is "not immediately apparent," the court looks at intrinsic evidence, such as the patent itself, the specification, and the prosecution history, to determine the meaning of the disputed claim term. *Id.* "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics*, 90 F.3d at 1582. The claim term is to be read "in the context of the particular claim in which the disputed term appears," as well as "in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. The specification, which contains a written description of the invention, is

4

"always highly relevant to the claim construction analysis,"
usually is "dispositive," and "is the single best guide to the
meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.

Limitations from the specification, however, should not be
imported into the claims. *Abbott Labs. v. Sandoz, Inc.*, 566
F.3d 1282, 1288 (Fed. Cir. 2009) (en banc); *Acumed LLC v.
Stryker Corp.*, 483 F.3d 800, 808 (Fed. Cir. 2007) (quoting
*Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed.
Cir. 1998) (noting the Federal Circuit's "repeated statements
that limitations from the specification are not to be read into
the claims")).  Similarly, if the specification describes a
single embodiment, the broader claim language will not be
limited "to that single application unless the patentee has
demonstrated a clear intention to limit the claim scope using
words or expressions of manifest exclusion or restriction."
*Sandoz*, 566 F.3d at 1288 (internal quotation marks and citations
omitted); *Phillips*, 415 F.3d at 1323 (rejecting "the contention
that if a patent describes only a single embodiment, the claims
of the patent must be construed as being limited to that
embodiment"); *Innova*, 381 F.3d at 1117 ("[P]articular
embodiments appearing in the written description will not be
used to limit claim language that has broader effect.")

Only if the claim term remains ambiguous after an examination of the intrinsic evidence may the court consider extrinsic evidence to determine the meaning of the claim. *Vitronics*, 90 F.3d at 1583; *see Phillips*, 415 F.3d at 1317 (emphasizing "the importance of intrinsic evidence in claim construction" but authorizing district courts to rely on extrinsic evidence).  Extrinsic evidence includes testimony by experts and the inventor, dictionaries, and learned treatises. *Phillips*, 415 F.3d at 1317.  While the extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Id.* (internal quotations marks and citations omitted).

### III. DISPUTED CLAIM TERMS

In their Joint Claim Construction and Prehearing Statement, the parties agreed to avoid co-mingling the terms in the '813 Patent and '435 Patent Family, but disagreed on the claim terms to be construed and the prioritization of claim construction. Irrespective of the parties' positions on whether a claim requires construction, I will construe each term proposed.

### A.    '813 Patent

Exergen is the assignee to the '813 Patent, titled "Radiation Detector Having Improved Accuracy," that was issued

6

in 1991.  The parties' construction dispute centers on Claim 7

which describes:

> A radiation detector comprising:
> a thermopile mounted to view a target of biological surface
>     tissue;
> a temperature sensor for sensing ambient temperature;
> an electronic circuit coupled to the thermopile and
>     temperature sensor and responsive to the voltage
>     across the thermopile and the temperature sensed by
>     the sensor to provide an indication of an ***internal
>     temperature within the biological tissue*** adjusted for
>     the ambient temperature to which the surface tissue is
>     exposed; and
> ***a display for providing an indication of the internal
>     temperature.***

'813 Patent col. 14 ll. 55-63 (emphasis added).  The disputed

claim terms are italicized above.

Exergen's '813 Patent was the subject of another patent

infringement suit before the late Judge Lindsay of this court,

who previously construed the patent.  *Exergen Corp. v. Wal-mart

Stores, Inc.* ("*Exergen I*"), No. 01-cv-11306-RCL, slip op. at 10

(D. Mass. filed Jul. 14, 2004).  After trial on the basis of

that construction, the Federal Circuit reversed the jury's

finding that the '813 Patent was infringed.  *Exergen Corp. v.

Wal-Mart Stores, Inc.* ("*Exergen II*"), 575 F.3d 1312 (Fed. Cir.

2009).

1.  "Internal temperature within the biological tissue"

In the prior action, Judge Lindsay construed the term

"internal temperature" in Claim 7 to mean "the temperature of

7

the region existing beneath the surface of the biological tissue targeted for measurement." *Exergen I*, No. 01-cv-11306-RCL, slip op. at 10.  On appeal, the Federal Circuit expressly noted that neither party "challenges the construction of 'internal temperature.'"  *Exergen II*, 575 F.3d at 1321.

Tecnimed adopts Judge Lindsay's construction for the term "internal temperature," but separately construes the term "within the biological tissue" to mean "which temperature is within such biological tissue."  Exergen argues that Judge Lindsay's construction of "internal temperature" applies to the larger term "internal temperature within the biological tissue," and that to construe the clause "within the biological tissue" yields "redundant verbiage."  Tecnimed invokes the doctrines of collateral estoppel and stare decisis, as well as the inventor's position in the '813 Patent reexamination proceedings, to defend its construction of the disputed '813 Patent claim terms.

### a) Collateral Estoppel

Under the doctrine of collateral estoppel, also called issue preclusion, "a judgment on the merits in a first suit precludes relitigation in a second suit of issues actually litigated and determined in the first suit." *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001) (citing *In re Freeman*, 30 F.3d 1459, 1465 (Fed. Cir. 1994)).  The law of

the regional circuit, here the First Circuit, applies to the issue of collateral estoppel. *RF Delaware v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1261 (Fed. Cir. 2003). Collateral estoppel applies if "(1) both proceedings involved the same issue of law or fact, (2) the parties actually litigated that issue, (3) the prior court decided that issue in a final judgment, and (4) resolution of that issue was essential to judgment on the merits." *Global NAPS, Inc. v. Verizon New England, Inc.*, 603 F.3d 71, 95 (1st Cir. 2010).

"In the patent context, it is usually the new defendant who invokes collateral estoppel against the patentee who has had a say in previous litigation of its patent." *Amgen, Inc. v. F. Hoffmann-La Roche Ltd.*, 494 F. Supp. 2d 54, 59-60 (D. Mass. 2007) (collecting cases). Here, the four elements of collateral estoppel are satisfied because Exergen was a party in a previous case before Judge Lindsay, in which the claims of the patent-in-suit here (the '813 Patent) were construed, and Exergen "had a full and fair chance to assert its arguments at that time." *Id.* at 60. As a result, "to the extent that this Court has already had the opportunity to construe the language of the claims in the patent at issue and no new arguments have been presented to dispute the previous constructions, fairness requires this court to adhere to the previous constructions" to avoid ambiguity and

uncertainty.  *Id.* (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996)).  Exergen therefore is precluded from seeking to alter Judge Lindsay's claim construction of "internal temperature" in Claim 7 of the '813 Patent for purposes of this subsequent litigation.

> *b) Stare Decisis*

Similarly, the doctrine of stare decisis "expresses the rule of adherence to judicial precedents," pursuant to which "a court is bound to follow a higher court's applicable holding . . . ."  *Amgen*, 494 F. Supp. 2d at 60.  In the patent context, "[w]here the Federal Circuit has already construed the claims here disputed, then that higher Court's construction is binding, and this Court cannot modify its holding."  *Id.; see also Markman*, 517 U.S. at 391 ("[T]reating interpretive issues as purely legal will promote (though it will not guarantee) intrajurisdictional certainty through the application of *stare decisis* on those questions not yet subject to interjurisdictional uniformity under the authority of the single appeals court.").

Here, Judge Lindsay previously construed the claim term "internal temperature," *Exergen I*, No. 01-cv-11306-RCL, slip op. at 10, and that construction was neither challenged by the parties on appeal nor disturbed by the Federal Circuit.  *Exergen*

*II*, 575 F.3d at 1321.  The claim construction effectively adopted by the Federal Circuit is binding legal precedent that cannot be modified in this case.  *Amgen*, 494 F. Supp. 2d at 60. Thus, as with the doctrine of collateral estoppel, the principle of stare decisis mandates the application of Judge Lindsay's prior construction of the term "internal temperature" in Claim 7 of the '813 Patent, as affirmed by the Federal Circuit, to the matter now before me.  I therefore construe the claim term "internal temperature within the biological tissue" to mean "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement."  *See Exergen I*, No. 01-cv-11306-RCL, slip op. at 10.

> *c) Reexamination Proceeding*

The construction directed by the doctrine of collateral estoppel and the principle of stare decisis has been accepted in parallel administrative proceedings where Exergen embraced Judge Lindsay's construction.  Moreover, during an *ex parte* reexamination of the '813 Patent in 2006, the United States Patent and Trademark Office ("PTO") rejected Claim 7 as anticipated by prior art.  The inventor, Dr. Francesco Pompei, sought to overcome that rejection by distinguishing the '813 Patent from prior art; to do so, Pompei quoted verbatim Judge Lindsay's construction of the term "internal temperature" in

11

Claim 7.   In response, the PTO issued a Notice of Intent to
Issue Ex Parte Reexamination Certificate, in which the PTO
listed reasons for patentability and "agreed that the definition
of 'internal temperature' as meaning 'the temperature of the
region existing beneath the surface of the biological tissue
targeted for measurement' as presented by the Trial Court in
instructions to the jury in litigation relating to [the '813
Patent] is pertinent."   Having presented Judge Lindsay's
definition of "internal temperature" to overcome a rejection for
anticipation, Exergen cannot skirt that same construction in
this subsequent action by attempting to broaden the term
"internal temperature" to encompass "internal temperature within
the biological tissue."   *Cf. Spectrum Int'l, Inc. v. Sterilite
Corp.*, 164 F.3d 1372, 1379 (Fed. Cir. 1998) ("[A] patentee,
after relinquishing subject matter to distinguish a prior art
reference asserted by the PTO during prosecution, 'cannot during
subsequent litigation escape reliance [by the defendant] upon
this unambiguous surrender of subject matter.'" (quoting
*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1581
(Fed. Cir. 1995)).

   d) *"Within the biological tissue"*

Bound by the construction of "internal temperature" in the
prior action, I separately address the construction of the term

12

"within the biological tissue" in Claim 7.  The language "internal temperature" is used twice in Claim 7: the first instance refers to "an internal temperature within the biological tissue," and the second mention is simply to "the internal temperature."  ('813 Patent col. 14 ll. 55-63).  I attribute the same meaning to both references regarding "internal temperature" because "[a] word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) (Michel).  At first blush, it might appear that to apply the construction of "internal temperature" to encompass "internal temperature within the biological tissue" would render the words "within the biological tissue" meaningless, which contradicts the principle that courts "must give meaning to all the words in [the] claims." *Exxon Chem. Patents*, *Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995); *see also Merck & Co. v. Teva Pharma. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

Nevertheless, while Judge Lindsay did not explicitly construe the term "within the biological tissue," he stated "[t]he language of the claims makes it clear . . . that the temperature to be measured by the patented inventions is the

temperature of the subsurface area within the targeted biological surface tissue." *Exergen I*, No. 01-cv-11306-RCL, slip op. at 9-10.  Tecnimed's proposed construction for "within the biological tissue" is "which temperature is within such biological tissue."  That construction gives the language its "ordinary and customary meaning," and "involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1312-14.  It also allows the term "internal temperature" to retain one meaning, irrespective of whether that language is followed by the qualifying language "within the biological tissue."  ('813 Patent, col. 14 ll. 55-63).

In sum, the term "internal temperature" in Claim 7 means "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement."  I construe "within the biological tissue" as "which temperature is within such biological tissue."  Combining those constructions, the claim term "internal temperature within the biological tissue" means "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement, which temperature is within such biological tissue."

2.    <u>"Display for providing an indication of the internal</u>
       <u>temperature"</u>

The parties also dispute the meaning of the term "display
for providing an indication of the internal temperature" in
Claim 7.  Exergen advances the construction "displaying the
internal temperature."  Tecnimed submits that the term means "a
display that shows the value that itself is the internal
temperature."

The meaning of this claim term was addressed by the Federal
Circuit in the appeal of the jury verdict in the prior action.
The Court quoted Dr. Pompei's testimony on direct examination
that "'a display for providing an indication' in claim 7 means
that '[o]n the display it *reads* a temperature that is . . . the
internal temperature.'"  *Exergen II*, 575 F.3d at 1321 (emphasis
and first alteration in original).  That testimony yielded the
Court's conclusion that "the number shown on the display must
itself be the value of the internal temperature; it cannot be
some other value requiring further (mental) computation before
arriving at the internal temperature."  *Id.*  The Federal
Circuit's construction is binding and should not, under
collateral estoppel doctrine and principles of share decisis, be
modified in this subsequent litigation.

Thus, I construe the term "display for providing an indication of the internal temperature" to mean "a display that shows the value that itself is the internal temperature."

**B.    '435 Patent Family**[3]

The remaining disputed claim terms arise out of the '435 Patent Family.

1.    "Internal temperature"

The parties dispute the meaning of the term "internal temperature" in Claims 1, 16, 29, and 32 of the '435 Patent; Claim 1 of the '347 Patent; Claims 1, 2, 9, 14, and 16 of the '877 Patent; and Claim 1 of the '309 Patent.  Exergen proposes the construction "a temperature inside a body."  Tecnimed requests the same construction applied to that term in the '813 Patent, specifically "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement."

Tecnimed advocates for a consistent construction of the claim term "internal temperature" across all of the patents at issue because Dr. Pompei is the inventor of the '813 Patent and '435 Patent Family and chose to use the same term in each patent. However, "[a] particular term used in one patent need not have

_____

[3] Because the patents in the '435 Patent Family have a common specification, all citations to that specification hereinafter will refer to the '435 Patent column and line numbers.

16

the same meaning when used in an entirely separate patent,
particularly one involving different technology." *Medrad Inc.
v. MRI Devices Corp.*, 401 F.3d 1313, 1318 (Fed. Cir. 2005).
While the relevant technology in every patent at issue is a
thermometer, "there are many situations in which the
interpretations will necessarily diverge." *Id.* Specifically,
"the manner in which the term is used in the patent may dictate
a definition that differs from the definition that would be
given to the same term in a different patent with a different
specification or prosecution history." *Id.* Characteristics
claimed by one patent, therefore, should not be attributed
automatically to claims in an improved patent "simply because the
applications had a common assignee, one common inventor, and
similar subject matter." *Abbott Labs. v. Dey, L.P.*, 287 F.3d
1097, 1105 (Fed. Cir. 2002).

Focusing on the claim language of the patents at issue, the
term "internal temperature" in the '813 Patent and '435 Patent
Family, respectively, are distinct in that the former refers to
the "internal temperature within the biological tissue" ('813
Patent col. 14 ll. 58-59), while the latter references the
"internal temperature of the body." ('435 Patent col. 7 ll. 33-
34). Unlike the '813 Patent, the '435 Patent Family does not
contain the language "within the biological tissue" in the

17

claims or specification, and therefore that limitation cannot constrain these patents. *See Medrad*, 401 F.3d at 1318 ("A patentee may define a particular term in a particular way, and in that event the term will be defined in that fashion for purposes of that particular patent, *no matter what its meaning in other contexts*." (emphasis added)).

To construe "internal temperature" in the '435 Patent Family, I begin with the intrinsic evidence. *Phillips*, 415 F.3d at 1314. The specification of the '435 Patent Family sets forth an equation for calculating "internal core temperature." ('435 Patent col. 2 ll. 23-25). The "present invention" embodied in the '435 Patent "compute[s] an internal temperature of the body as a function of ambient temperature and sensed surface temperature." (*Id.* at col. 2 ll. 35-37). A preferred embodiment explains that "electronics . . . compute sensed skin temperature, and using arterial heat balance equations, compute an *internal core temperature* for display," and that "[i]n typical home applications, the core temperature is displayed as the equivalent *oral temperature*." (*Id.* at col. 3 ll. 58-62 (emphasis added)). That embodiment also notes that "[s]ince *all body site temperatures of interest* arise from the arterial temperature source, the arterial heat balance can be applied to any site," and accordingly, "*oral and rectal diagnostic*

18

*equivalents* . . . of arterial temperature can be calculated . .

. ." (*Id.* at col. 3 ll. 19-25 (emphasis added)).

Exergen's proposed construction of "internal temperature" as
"a temperature inside a body" is supported by both the
specification and preferred embodiment, as it applies to core,
oral, and rectal temperatures.  This proposal accords the claim
term its "ordinary and customary meaning." *See Phillips*, 415
F.3d at 1312.  In further support of its construction, Exergen
cites extrinsic evidence: the dictionary definitions of
"internal" as "situated near the inside of the body" or "present
or arising within an organism or one of its parts." Merriam
Webster's Collegiate Dictionary 611 (10th ed. 1997).  These definitions
bolster a broader construction of "internal temperature" that is
not specific to a certain body part or region.  Thus, I construe
the term "internal temperature" in the '435 Patent Family as "a
temperature inside a body."

2.   "Compute," "function," and "weighted difference" terms

Several claims in the '435 Patent Family include the
following representative language:

> electronics which compute an internal temperature of the
> body as a function of an ambient temperature and a sensed
> surface temperature, the function including a weighted
> difference of the sensed surface temperature and the
> ambient temperature, the weighted difference including a
> weighting factor which varies with the sensed surface
> temperature.

'435 Patent Claim 1; *see also id.* Claims 16, 29, 32; '877 Patent Claims 1, 2, 9, 14, 16; '347 Patent Claim 1; '309 Patent Claim 1.

The parties dispute the meaning of the clause "compute an internal temperature of the body as a function of an ambient temperature and a sensed surface temperature." (*See, e.g.*, '435 Patent Claim 1). Exergen construes this term as "determine an internal temperature of the body by using both an ambient temperature and a sensed surface temperature." Tecnimed separately construes the claim term "compute" as "calculate" and "as a function of" as "using an equation."

Additionally, the parties propose different constructions for the phrase "the function including a weighted difference of the sensed surface temperature and the ambient temperature." Exergen maintains that this term means "the relationship between sensed surface temperature, ambient temperature and the internal temperature produced by the electronics including a multiplication of the difference between the sensed surface temperature and the ambient temperature by a weighting factor." By contrast, Tecnimed asks me to define "the function" as "the equation" and "weighted difference" as "a subtraction of one from the other of the sensed surface temperature and the ambient temperature, multiplied by a weighting factor."

I examine separately the terms "compute," "function," and "weighted difference."

### a) Compute

The claims describe "electronics which compute an internal temperature of the body as a function of" (*See, e.g.*, '435 Patent Claim 1), as well as "a method of detecting body temperature comprising . . . computing an internal temperature of the body as a function of . . . ." (*See, e.g. id.* Claim 29).

Exergen argues that the plain and ordinary meaning of "compute" is "determine." *See Phillips*, 415 F.3d at 1312.  This construction, Exergen asserts, is consistent with a preferred embodiment in the specification, which states "[t]he temperature determined by the microprocessor is displayed on the liquid crystal display . . . ." ('435 Patent col. 4 ll. 9-10). Additionally, Exergen cites as extrinsic evidence a dictionary definition of "compute" which means "to determine esp. by mathematical means." MERRIAM WEBSTER'S, *supra*, at 237.  However, the same dictionary equally supports Tecnimed's construction by also defining "compute" as "to make calculation." *Id.*

Arguing that "determine" is too broad, Tecnimed instead advances that "compute" must mean "calculate" because "the claims themselves require the construction: that a mathematical equation must be calculated, and not just a relationship met."

Tecnimed draws support for this assertion from the claims,[4] which recite electronics computing an internal temperature, where that temperature is a function of ambient temperature and sensed surface temperature, and that function includes "a weighted difference of the sensed surface temperature and the ambient temperature." (*See, e.g.*, '435 Patent Claim 1).  According to Tecnimed, "weighted difference" is a "mathematical expression" and consequently "calculation of the mathematical expression is required."

Tecnimed's construction is bolstered by the prosecution history.  In an October 2000 PTO Office Action, the Examiner rejected Claim 1 of the '347 Patent as anticipated by U.S. Patent No. 5,150,969 (filed Jul. 10, 1991) (the "Goldberg Patent").  Dr. Pompei, in response, distinguished the Goldberg Patent on the basis that "nowhere in [the Goldberg] equation is there a *subtraction of ambient temperature from surface temperature.*  In fact, there is *no temperature difference at all included in the*

---

[4] Tecnimed also cites references to the term "compute" in the specification (*see, e.g.*, '435 Patent col. 3 l. 11; *id.* at col. 3 ll. 58-59), but I find none of these passages sheds light on the construction of compute.  Similarly, Tecnimed's citation to the word "calculate" in the Background of the Invention is unhelpful because the Background is describing prior art, not the present invention.  (*See* '435 Patent col. 1 ll. 16-18 ("Such thermometers measure temperature of distal ear canal tissue and calculate arterial temperature via heat balance."))

*equation*." (emphasis added).  The inventor's express embrace of a limitation in the '347 Patent applies to the related patents in the '435 Patent Family because "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation."  *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999).  The '347 Patent is the second of four patents in the '435 Patent Family, and its history also governs the construction of the claims in the '877 and '309 Patents.

In view of the claim language, prosecution history, and extrinsic evidence, I adopt Tecnimed's construction of "compute" as "calculate."

   b) *As a function of / the function*

In light of my construction of "compute," I also accept Tecnimed's proposals that "as a function of" means "using an equation" and that "the function" means "the equation."  It is clear from the claims themselves that an equation is required to compute the internal temperature.  The language "the function including a weighted *difference* of the sensed surface temperature and the ambient temperature" is used, for example, in Claim 1 of the '435 Patent. (emphasis added).  Although a

23

specific equation is not recited in the claims themselves, the requirement of some subtraction equation is explicit. (*See, e.g.*, '435 Patent, Claim 1).

The specification also supports Tecnimed's construction. The Summary of the Invention states "internal core temperature can be computed from the function" and then provides an equation. ('435 Patent col. 2 ll. 23-28). Furthermore, as discussed above, the prosecution history reveals that Dr. Pompei specifically cited the invention's subtraction equation or "temperature difference" as a distinguishing factor from prior art.

By contrast, Exergen's proposed constructions - "by using both an ambient temperature and a sensed surface temperature" and "the relationship between sensed surface temperature, ambient temperature and the internal temperature produced by the electronics" - are vague and unsupported.  While it is true that the ambient temperature and sensed surface temperature are part of the "function," that function is more than a "particular relationship" requiring a weighted difference and a weighting factor, as advanced by Exergen.  This description only blurs the issue that the relationship is a subtraction equation. Furthermore, Exergen's citation to dictionary definitions and a

case construing the term "function" in a different patent[5] are not dispositive because extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of the claim language." *Phillips*, 415 F.3d at 1317.  As a result, I construe the term "as a function of" in the '435 Patent Family to mean "using an equation."  Similarly, I construe the term "the function including" means "the equation including."

  *c) Weighted Difference*

  The function described in the claims includes "a weighted difference of the sensed surface temperature and the ambient temperature." (*See, e.g.*, '435 Patent Claim 1).  Exergen argues that a "weighted difference" does not specifically require subtraction, and therefore that claim term should not be limited to subtraction or, more generally, an equation.  In support of its position that "difference" is not limited to subtraction, Exergen quotes a dictionary definition of "difference" as "the degree or amount by which things differ in quantity or measure." MERRIAM WEBSTER'S, *supra*, at 323.  This quotation, however, is

---

[5] *See Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 264 F. Supp. 2d 135, 151 (D. Del. 2003) (construing "function of" as "a mathematical or logical relationship").  Exergen cannot rely on similar terms in an unrelated patent with a different specification and prosecution history to construe the claims-in-suit.  *See Medrad*, 401 F. 3d at 1318-19.

incomplete; the dictionary definition then explicitly refers the reader to the definition of the word "remainder" that states "the number left after a subtraction." *Id.* at 988.  Exergen cannot escape the fact that the relationship described in the patent claims necessarily includes a subtraction between the sensed surface temperature and the ambient temperature.

Nor can Exergen broaden the term "difference" to include "more than just subtraction," such that subtraction is necessary but not sufficient.  As already discussed, Dr. Pompei avoided anticipation of the '435 Patent Family by arguing that "nowhere in [the Goldberg] equation is there a *subtraction of ambient temperature from surface temperature.*  In fact, there is *no temperature difference at all included in the equation.*" Tecnimed's proposed construction accounts for that "subtraction of one from the other of the sensed surface temperature and the ambient temperature," and includes the remaining part of the function, i.e. the equation described in the claims, in which that difference value is "multiplied by a weighting factor."

I therefore agree with Tecnimed that "weighted difference" must be construed as "a subtraction of one from the other of the sensed surface temperature and the ambient temperature, multiplied by a weighting factor."

3.    "Assumed ambient temperature"

Claims 16 and 32 of the '435 Patent and Claims 9 and 16 of the '877 Patent reference "assumed ambient temperature". The patent claims state, in relevant part, "electronics which compute an internal temperature of the body as a function of an ambient temperature and a sensed surface temperature, wherein the ambient temperature within the function is *an assumed ambient temperature*." (*E.g.*, '435 Patent, Claim 16 (emphasis added)).

Exergen proposes this term means "temperature determined in whole or in part prior to viewing the target surface area with the radiation sensor for taking a measurement." Tecnimed construes this term as "a temperature predominantly based upon an expectation as to where the body temperature detector will be placed when in use."

The construction analysis begins with an examination of the intrinsic evidence. In the '435 Patent, Claim 23 describes the assumed ambient temperature as "fixed." Alternatively, Claim 17 states "the assumed ambient temperature is modified as a function of a sensed detector temperature, a change in the assumed ambient temperature relative to change in the sensed detector temperature being significantly less that 1." Thus, the claims differ in that the assumed ambient temperature can be

27

a fixed value or a modified value of the sensed detector temperature.

These alternative descriptions also appear in the preferred embodiments.  Recognizing that "during a short measurement period which is significantly less than the thermal time constant of the measurement environments, the detector temperature is a poor estimate of ambient temperature," the patent first describes a fixed value: "it has been found that, without an accurate ambient temperature measurement, *a more appropriate choice for ambient temperature* in equation 1 is *an assumed temperature* of 80°." ('435 Patent col. 6 ll. 57-64 (emphasis added)).  The second embodiment indicates a modified value in which "[t]he assumed temperature can be improved by considering the detector temperature, but rather than having the ambient temperature directly coincide with the sensed detector temperature, only a 20% weighting is given to the detector temperature." (*Id.* at col. 6 l. 64 through col. 7 l. 1).

To account for the latter embodiment, in which the assumed temperature relies on taking the sensed detector temperature and then weighting that value, Exergen argues that, "in some embodiments, the predetermined ambient temperature is used *in part* and, in other embodiments, the predetermined ambient temperature is used *in whole*. In either embodiment, at least a

28

portion of the assumed ambient temperature is determined *prior to* the time of measurement."   Exergen agrees that Tecnimed's proposal "includes the essence of 'assumed' (*i.e.*, 'based upon an expectation')," but contends that it fails to distinguish assumed from sensed ambient temperature.   I disagree; Tecnimed's construction invokes a predetermined temperature, i.e. is "based upon an expectation," as opposed to the value sensed or detected by the device.

Tecnimed's construction is also supported by the extrinsic evidence.   The applicable construction of "assumed ambient temperature" may be deduced from Dr. Pompei's deposition testimony because, for purposes of claim construction, the "inventor is a competent witness to explain the invention and what was intended to be conveyed by the specification and covered by the claims."   *Voice Techs. Group, Inc.* v. *VMC Sys., Inc.*, 164 F.3d 605, 615 (Fed. Cir. 1999).   Furthermore "[t]he testimony of the inventor may also provide background information, including explanation of the problems that existed at the time the invention was made and the inventor's solution to these problems."   *Id.*   Dr. Pompei explained the assumed ambient temperature described in the preferred embodiments, ('435 Patent, col. 6 ll. 53-64), as follows:

29

you put [the axilla device] under the arm . . . for a few
seconds. What ambient temperature do you use in terms of
getting a good result? . . . [T]he most appropriate way to
deal with this is that the device will always start at room
temperature and it will always put in for a few seconds,
and during that period of time, it will always warm up to
roughly the 80 degrees, which is what is specified here.

This testimony is interpreted by Tecnimed as defining the

"assumed ambient temperature" as "the expected environmental

temperature of the arm pit, which is an enclosed environment

and, therefore, at a higher temperature than the ambient

temperature in an open room."  Thus, it is "expected" that the

axillary thermometer will be placed in the armpit, which has an

assumed ambient temperature of 80°.

Dr. Pompei's testimony is corroborated by the prosecution

history, which reveals that the assumed ambient temperature is

the estimated ambient temperature of the body location where the

device is used.  The Examiner initially rejected the claims of

the '435 Patent as indefinite under 35 U.S.C. § 112.  In

response, the applicant explained that "[o]ne skilled in the

art, having the teachings of the present application in hand,

could readily determine other assumed temperatures for other

applications *such as other body locations* and other

environmental applications."  As an example, the application

said that "one skilled in the art would readily recognize that a

detector designed for use in a cold outdoor environment *may*

30

*assume a lower ambient temperature*."  Tecnimed's construction, unlike Exergen's, accounts for this disclaimed aspect of the patent by factoring in the location of "where the body temperature detector will be placed when in use."

Exergen insists that assumed ambient temperature is defined by "the timing, not the place," but the patent itself does not incorporate a timing requirement as a means of distinguishing between assumed and sensed temperature.  Rather Tecnimed's constructions indicate that the assumed temperature is "based upon an expectation," whereas the sensed temperature is simply "detected" by the device.  An artificial distinction based on timing departs from the intrinsic evidence, prosecution history, and the inventor's testimony.  As a result, I construe "assumed ambient temperature" as "a temperature predominantly based upon an expectation as to where the body temperature detector will be placed when in use."

4.   "Weighting" terms

The '435 Patent Family includes "weighting" terms, specifically the weighting factor, the weighting coefficient, and weighting.  The parties agree that all three claim terms involve a variable; however, Tecnimed accords the same construction to each of these terms, while Exergen's

constructions vary slightly.  I discuss the terms and the
parties' proposed constructions in turn.

> a) "Weighting factor"

A "weighting factor which varies with the sensed surface
temperature" is claimed in the '435 Patent (Claims 1 and 29) and
the '877 Patent (Claims 2 and 14).  Exergen defines "weighting
factor" as "a number or variable used to multiply."  Tecnimed
puts forth the construction "a variable factor that is an
approximation of h/pc where h is a heat transfer coefficient
between the target surface and ambient, p is the perfusion rate,
and c is blood specific heat."

Tecnimed's construction recites, verbatim, dependent Claim 2
in the '435 Patent and dependent Claim 3 in the '877 Patent.
Exergen objects that Tecnimed impermissibly incorporates into
the independent claims the limitations from the dependent
claims.  *See Phillips*, 415 F.3d at 1315 ("[T]he presence of a
dependent claim that adds a particular limitation gives rise to
a presumption that the limitation in question is not present in
the independent claim."). Exergen accordingly advances a broader
construction because the '435 Patent Family "does not specify one
weighting factor for all temperature determinations."

However, Exergen is mistaken because Tecnimed's
construction also accords with the specification of the '435

32

Patent Family.  The Summary of the Invention uses the same definition of "weighting" as the dependent claims, quoted above. ('435 Patent col. 2 ll. 40-43).

Similarly, one of the drawings is said to "illustrate[] the change in weighting coefficient h/pc with change in skin temperature." (*Id.* at col. 3 ll. 43-44).  The weighting coefficient is again describe as h/pc in a preferred embodiment. (*Id.* at col. 5 l. 22).

Exergen's alternative construction is far too broad, and permits the weighting terms to be virtually any number or variable.  That construction ignores the patent family's consistent application of h/pc as the coefficient.  Rejecting Exergen's approach, I construe "weighting factor" as "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat."

b) *"Weighting coefficient"*

Claim 1 of the '309 Patent describes "the ambient temperature weighted by a weighting coefficient, the weighting coefficient being varied with the sensed target temperature." Exergen defines the "weighting coefficient" as "a number or variable used to multiply," and Tecnimed ascribes the construction "a variable factor that is an approximation of h/pc

where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat."

Exergen argues that defining weighting coefficient narrowly as h/pc violates the principle of claim construction which prohibits incorporating limitations from the preferred embodiment into the specification of the claims.  However, as discussed *supra*, the Summary of the Invention section of the specification defines the term "weighting" as an approximation of h/pc.  ('435 Patent col. 2 ll. 40-43).  That section also expressly references "a weighting coefficient h/pc" (*Id.* at col. 2 ll. 31-31), and that definition is repeated throughout the patent.  (*Id.* at col. 3 l. 43; col. 5 l. 21; col. 5 l. 66; col. 6 l. 13).  It is axiomatic that a claim term is to be read "in the context of the entire patent, including the specification," *Phillips*, 415 F.3d at 1313, and that the specification "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582.  To construe this term in any other way would disregard established claim construction protocols.

Thus, "weighting coefficient" must be construed as "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat."

34

c) "Weighting"

Weighting is construed by Exergen as "multiplying by a number variable," and by Tecnimed as "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat."  As previously discussed, the specification expressly states "weighting is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat."  ('435 Patent col. 2 ll. 40-43).  I apply that construction to all the claims.

5.   "Target surface area"

The parties dispute the construction of the claim term "target surface area" in the '435 Patent Family.  (*See* '435 Patent Claims 1, 16, 29, 32; '347 Patent Claim 1; '309 Patent Claim 1). Exergen proposes the construction "an area of a surface within the viewing range of the radiation sensor."  Tecnimed construes that term as "a living layer of external human tissue that has a temperature that can be measured."

Tecnimed's proposed construction is identical to Judge Lindsay's construction of the term "target of biological surface tissue" in the '813 Patent.  *See Exergen I*, No. 01-cv-11306-RCL,

slip op. at 5.  Tecnimed's justification for adhering to the construction established in the prior action is the patents' shared inventor who "chose to use virtually identical terms." That common denominator, as previously discussed, is not a sufficient basis for attributing characteristics claimed in one patent to another patent.  *Dey*, 287 F.3d at 1105.  The constructions given to the '813 Patent claim terms in the prior action do not necessarily bind the '435 Patent Family.  *See Medrad*, 401 F.3d at 1318.

Here, the case for an independent construction is particularly compelling because the claim terms themselves differ:  the '813 Patent refers to "target of *biological surface area*" and the '435 Patent Family relates to the "target *surface area*."  Tecnimed offers no intrinsic evidence for its proposed construction.  I find, therefore, that the construction of "target surface area" in the '435 Patent Family requires an independent analysis, informed by the specifications and claims of those patents.

The specification of the '435 Patent states that "[i]n accordance with the present invention, a body (i.e., human or animal) temperature detector comprises a radiation sensor which views a *target surface area* of the body."  ('435 Patent col. 2 ll. 32-34 (emphasis added)).  Tecnimed's construction, by

36

contrast, improperly limits the construction to "external human tissue," which directly contradicts the specification's application to human or animal tissue.  Consistent with the specification, the claims themselves recite "a radiation sensor which views a target surface area of a body."  (*See, e.g.*, '435 Patent col. 7 ll. 31-32).  The intrinsic evidence accords with Exergen's definition, and I therefore construe "target surface area" as "an area of a surface within the viewing range of the radiation sensor."

   6.   "Body" terms

   The parties disagree on the construction of the claim terms "body" ('435 Patent Claims 1, 16, 29, 32; '347 Patent Claim 1; '877 Patent Claims 1, 2, 9, 14, 16; '309 Patent Claim 1) and "surface temperature of the body" ('877 Patent Claims 1, 2, 9, 14, 16) in the '435 Patent Family.

      a) "*Body*"

   "Body" is construed by Exergen as "any living mammal," and by Tecnimed as "an entire living human."  Exergen argues that Tecnimed's limitation of the term to "human" is unsupported by the patent specification.  I agree; the specifications of the '435 Patent Family each describe "a body (i.e., human or animal) temperature detector" and expressly do not limit the inventions to humans.  ('435 Patent col. 2 ll. 32-33).  Tecnimed does not

refute this intrinsic evidence. Accordingly, I construe "body" as "any living mammal."

　　　b) "*Surface temperature of the body*"

Exergen defines "surface temperature of the body" in the '877 Patent as "temperature of a surface of a living mammal." Tecnimed proposes the construction "the temperature of a living layer of external human tissue that has a temperature that can be measured."

Tecnimed derives its construction from Judge Lindsay's construction of the claim term "biological surface tissue" in the prior action surrounding the '813 Patent. *See Exergen I*, No. 01-cv-11306-RCL, slip op. at 5-8. Such construction by derivation is inappropriate because, as previously discussed, the '813 Patent claim constructions do not automatically apply here, especially in this instance where the claim terms are not the same.

Therefore, I decline to limit the claims to humans, as Tecnimed suggests, because the '877 Patent specification is explicit that "body" means "human or animal." ('877 Patent col. 2 ll. 40-41). Tecnimed's proposed limitation to "tissue" is also inappropriate where I have construed "body" more broadly as "any living mammal." Additionally, the claim term must be read "in

the context of the particular claim in which the disputed term appears," *Phillips*, 415 F.3d at 1313, and Claims 1, 2, 9, 14, and 16 of the '877 Patent do not use the word "tissue" alone. (*Cf.* '813 Patent col. 14 ll. 50-61 (claiming "biological surface tissue," "biological tissue," and "surface tissue")).  I therefore define the claim term "surface temperature of the body" to mean "temperature of a surface of a living mammal."

      7.   "Sensed ambient temperature"

The claim term "sensed ambient temperature" appears in Claim 1 of the '347 Patent.  Exergen advances the construction "temperature determined by a sensor at time of viewing the target surface area with the radiation sensor for taking a measurement."  Tecnimed submits this term means "detected ambient temperature."

Both parties base their constructions on the specification which states that "the ambient temperature . . . used in the arterial heat balance function has been taken as the sensed detector temperature."  ('435 Patent col. 2 ll. 59-61).  Tecnimed objects that Exergen's construction "attempts to rewrite the claim entirely by replacing ['sensed detector temperature'], and by reading limitations into the claim to now require some 'time' limitation as to when the ambient temperature is sensed."  Exergen, for its part, seeks to distinguish "sensed ambient

temperature" from "assumed ambient temperature," such that the "assumed" value is based on an expectation before taking the measurement and the "sensed" value is that taken at the time the detector is used.

In support of its construction, Exergen cites references to the time period of measurement in the specification.  First, the summary of the invention explains that "thermal equalization of a temperature detector with its measurement environment may take many seconds . . . ."  ('435 Patent col. 2, ll. 61-65). Similarly, a preferred embodiment indicates that "during a short measurement period which is significantly less than the thermal time constant of the measurement environments, the detector temperature is a poor estimate of ambient temperature." (*Id.* at col. 6 ll. 57-61).

It is axiomatic, however, that limitations from the specification should not without more be read into the claims, *Sandoz*, 566 F.3d at 1288.  Therefore, I agree with Tecnimed that the construction of "sensed ambient temperature" need not contain a "time" limitation.  Moreover, such a limitation is absent from the '347 Patent claims, and the claim at issue does not even refer to assumed ambient temperature, which Exergen seeks to distinguish.  As a result, I adopt Tecnimed's proposal

40

and Construe "sensed ambient temperature" to mean "detected ambient temperature."

## IV. CONCLUSION

For the foregoing reasons, I find that each disputed term should be construed as reflected in the attached Appendix below: Claim Construction Summary and

IT IS FURTHER ORDERED

That the parties submit on or before June 10, 2016 a joint proposed scheduling order setting forth dates certain for the conclusion of discovery, summary judgment practice and any other dates necessary to be established to bring this case to judgment.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

## V. APPENDIX: CLAIM CONSTRUCTION SUMMARY

### A.    '813 Patent

| Phrase(s) in Patent | "internal temperature within the biological tissue" |
|---|---|
| Plaintiffs' Construction | "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement" |
| Defendants' Construction | "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement which temperature is within such biological tissue" |
| Court's Construction | "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement, which temperature is within such biological tissue" |

| Phrase(s) in Patent | "display for providing an indication of the internal temperature" |
|---|---|
| Plaintiffs' Construction | "displaying the internal temperature" |
| Defendants' Construction | "a display that shows the value that itself is the internal temperature" |
| Court's Construction | "a display that shows the value that itself is the internal temperature" |

**B.**    **'435 Patent Family**

| Phrase(s) in Patent | "internal temperature" |
|---|---|
| Plaintiffs' Construction | "a temperature inside a body" |
| Defendants' Construction | "the temperature of the region existing beneath the surface of the biological tissue targeted for measurement" |
| Court's Construction | "a temperature inside a body" |

| Phrase(s) in Patent | "compute" |
|---|---|
| Plaintiffs' Construction | "determine" |
| Defendants' Construction | "calculate" |
| Court's Construction | "calculate" |

| Phrase(s) in Patent | "as a function of" / "the function" |
|---|---|
| Plaintiffs' Construction | "the relationship between" |
| Defendants' Construction | "using an equation" / "the equation" |
| Court's Construction | "using an equation" /"the equation" |

| Phrase(s) in Patent | "the function including a weighted difference of the sensed surface temperature and the sensed ambient temperature" |
|---|---|
| **Plaintiffs' Construction** | "the relationship between sensed surface temperature, sensed ambient temperature and the internal temperature produced by the electronics includes a multiplication of the difference between the sensed surface temperature and the sensed ambient temperature by a weighting factor" |
| **Defendants' Construction** | "a subtraction of one from the other of the sensed surface temperature and the ambient temperature, multiplied by a weighting factor" |
| **Court's Construction** | "a subtraction of one from the other of the sensed surface temperature and the ambient temperature, multiplied by a weighting factor" |

| Phrase(s) in Patent | "assumed ambient temperature" |
|---|---|
| **Plaintiffs' Construction** | "temperature determined in whole or in part prior to viewing the target surface area with the radiation sensor for taking a measurement" |
| **Defendants' Construction** | "a temperature predominantly based upon an expectation as to where the body temperature detector will be placed when in use" |
| **Court's Construction** | "a temperature predominantly based upon an expectation as to where the body temperature detector will be placed when in use" |

| Phrase(s) in Patent | "Weighting coefficient" |
|---|---|
| **Plaintiffs' Construction** | "a number or variable used to multiply" |
| **Defendants' Construction** | "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat" |
| **Court's Construction** | "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat" |

| Phrase(s) in Patent | "Weighting factor" |
|---|---|
| **Plaintiffs' Construction** | "a number or variable used to multiply" |
| **Defendants' Construction** | "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat" |
| **Court's Construction** | "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat" |

| Phrase(s) in Patent | "Weighting" |
|---|---|
| Plaintiffs' Construction | "multiplying by a number variable" |
| Defendants' Construction | "a variable factor that is an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat" |
| Court's Construction | "an approximation of h/pc where h is a heat transfer coefficient between the target surface and ambient, p is the perfusion rate, and c is blood specific heat" |

| Phrase(s) in Patent | "Target surface area" |
|---|---|
| Plaintiffs' Construction | "an area of a surface within the viewing range of the radiation sensor" |
| Defendants' Construction | "a living layer of external human tissue that has a temperature that can be measured" |
| Court's Construction | "an area of a surface within the viewing range of the radiation sensor" |

| Phrase(s) in Patent | "Body" |
|---|---|
| Plaintiffs' Construction | "any living mammal" |
| Defendants' Construction | "an entire living human" |
| Court's Construction | "any living mammal" |

| Phrase(s) in Patent | "Surface temperature of the body" |
|---|---|
| Plaintiffs' Construction | "temperature of a surface of a living mammal" |
| Defendants' Construction | "the temperature of a living layer of external human tissue that has a temperature that can be measured" |
| Court's Construction | "temperature of a surface of a living mammal" |

| Phrase(s) in Patent | "Sensed ambient temperature" |
|---|---|
| Plaintiffs' Construction | "temperature determined by a sensor at time of viewing the target surface area with the radiation sensor for taking a measurement" |
| Defendants' Construction | "detected ambient temperature" |
| Court's Construction | "detected ambient temperature" |